**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

|  |  |
|---|---|
| In re: | |
| **MATCHBOX FOOD GROUP, LLC, et al.,** | **Case No. 20-17250-LSS** |
| **Debtors.** [1] | |
| | **Chapter 11** |

**DISCLOSURE STATEMENT WITH RESPECT TO
DEBTORS' PLAN OF LIQUIDATION**

### ARTICLE I.     INTRODUCTION

Pursuant to Section 1125 of Title 11 of the United States Code, Matchbox Food Group, LLC, Matchbox Rockville, LLC, Matchbox Capitol Hill, LLC, Gene Poole, LLC, Caribou Hunter, LLC, Buttermilk, LLC, Blue Eagle, LLC, First MB Star, LLC Matchbox 14th Street, LLC and Hammer and a Cocktail, LLC (collectively the "Debtors"), the debtors and debtors in possession herein, by and through their attorneys Janet M. Nesse and Justin P. Fasano of McNamee, Hosea, Jernigan, Kim Greenan & Lynch, P.A., submit this disclosure statement (the "Disclosure Statement") for use in the solicitation of votes on the Plan.  A copy of the Plan is annexed as **Exhibit A** to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition financial history, the reason why they filed for bankruptcy, and significant events that have occurred during these Chapter 11 Cases.  This Disclosure Statement also describes terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS

---

[1] The Debtors include Matchbox Rockville, LLC, case no. 20-17247-LSS; Matchbox Capitol Hill, LLC, case no. 20-17252-LSS; First MB Star, case no. 20-17254-LSS; Caribou Hunter, LLC, case no. 20-17255-LSS; Buttermilk, LLC, case no. 20-17257-LSS; Hammer and a Cocktail, LLC, 20-17260-LSS; Blue Eagle, LLC, 20-17262-LSS; Matchbox 14th Street, LLC, case no. 20-17263-LSS; and Gene Poole, case no. 20-17266-LSS.

IN THESE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE ESTATES TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATES AND THE HOLDERS OF ALL CLAIMS.  ACCORDINGLY, THE DEBTORS URGE HOLDERS OF CLAIMS TO VOTE TO ACCEPT THE PLAN.**

## ARTICLE II.    <u>PLAN VOTING INSTRUCTIONS AND PROCEDURES</u>

**A.        Notice to Holders of Claims and Interests**

This Disclosure Statement will be transmitted to Holders of Claims that are entitled to vote on the Plan.  A discussion and listing of those Holders of Claims that are entitled to vote on the Plan and those Holders of Claims that are not entitled to vote on the Plan is provided herein. The primary purpose of this Disclosure Statement is to provide adequate information to enable such Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court has been asked to approve this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such Claimholders to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT SUCH HOLDERS ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT HOLDERS RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY.  IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been

authorized to distribute any information concerning the Debtors other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  The Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time *subsequent* to the date hereof.

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

## B.      Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired *and* that are in a class that will receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a proposed chapter 11 plan.  Classes of claims in which the holders of claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Classes of claims or interests that receive no distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitled the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults.  In addition, a holder of an impaired claim or interest which is entitled to receive or retain property under a plan may vote to accept or to reject a plan only if the claim or interest is "allowed" for purposes of voting, which means generally that no party in interest has objected to such claim or interest or, if no proof of claim was filed, that such claim or interest has not been scheduled by the debtor as contingent, unliquidated or disputed.

Thus, the Holder of a Claim against the Debtors that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (i) the Plan provides a Distribution in respect of such Claim, (ii)(a) the Claim has been scheduled by a Debtor (and such claim is not scheduled at zero or as disputed, contingent or unliquidated) or (b) the Claimholder has filed a Proof of Claim on or before the Bar Date applicable to such Holder, pursuant to Bankruptcy Code sections 502(a) and 1126(a) and Bankruptcy Rules 3003 and 3018 (or the Debtors have timely filed a Proof of Claim on behalf of such Creditor), and (iii) (a) no objection to the Claim has been timely filed or any timely objection been withdrawn, dismissed or denied by Final Order, or (b) pursuant to

Bankruptcy Rule 3018(a), upon application of the Holder of the Claim with respect to which there has been an objection, the Bankruptcy Court temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

## C.        Acceptance of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.  Acceptance of a plan by a class of interests requires acceptance by at least two-thirds (2/3) of the number of shares in such class that cast ballots for acceptance or rejection of the plan.

Bankruptcy Code section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

After approval of this Disclosure Statement by the Bankruptcy Court, a copy of the Plan will be mailed to all creditors, all parties-in-interest entitled to vote pursuant to § 1126 of the Bankruptcy Code, and within the manner specified by Bankruptcy Rule 3017(d), accompanied by a ballot. Pursuant to § 1126(a) of the Bankruptcy Code, any holder of an Allowed Claim or an Allowed Interest may accept or reject the Plan.  However, approval or rejection of the Plan is measured by Classes of Claims and interests rather than by each Claim holder or interest holder. A Class of Claims or interests which is not impaired by the Plan is conclusively presumed to have accepted the Plan.  Accordingly, no Class of Claims that is unimpaired by the Plan need submit a ballot for voting.

If this Disclosure Statement is approved, then pursuant to § 1128 of the Code and Bankruptcy Rules 2002(b), 3017 and 3018, the Court shall conduct a hearing to consider confirmation of the Plan on twenty eight (28) days notice to creditors and parties in interest, unless shortened by order of the Bankruptcy Court.  A party-in-interest may object to the confirmation of the Plan. The date by which objections must be filed to the confirmation of the Plan and by which votes must be submitted shall be established at a date and in a manner as determined by the Bankruptcy Court.

## ARTICLE III.    HISTORY, OPERATIONS, AND STRUCTURE OF THE DEBTORS

Matchbox Food Group, Inc. operated a chain of mid-priced dine in restaurant that did business under the name "Matchbox."  Matchbox was founded in 2003 with two restaurants in Washington, D.C. by the original ownership group of Ty Neal, Mark Neal, Drew Kim, and Perry Smith ("Original Ownership Group").  Since 2012, Matchbox expanded aggressively, and raised significant financing to do so.  In 2015, the Debtors raised approximately $20 million in an equity offering which diluted the Original Ownership Group to 60% ownership.

The Debtors originally borrowed funds from EagleBank on a restaurant level, all of which was rolled-up into an amended and restated promissory note from all Debtors in 2018.  At the time these cases were filed, EagleBank was owed approximately $10,433,121.67.

In Fall 2015, the Debtors borrowed approximately $10 million on a second-lien secured basis from a group of investors led by the Potomac Investment Trust (the "PIT Group"). The beneficiaries of the Potomac Investment Trust include certain members of the Debtors' board of directors. The grantor of the Potomac Investment Trust, who represents the PIT Group, is a member of the Debtors' board of directors, as are several participating lenders.

In August 2016, the Debtors borrowed approximately $10 million on a third lien secured basis from Egg Cream, LLC ("Egg Cream"). Investors in Egg Cream include certain members of the Debtors' board of managers. As part of the Egg Cream financing, the Original Ownership Group was diluted to 10% ownership.

The Debtors formerly owned a chain of five restaurants called Ted's Bulletin. Those restaurants were sold in October 2017, netting approximately $3 million for the Debtors. That money was used to fund operations and has been depleted.

In 2017, the Original Ownership Group sued Matchbox, EagleBank, Potomac Investment Trust, Egg Cream, and others, alleging a conspiracy to force them out of the company. After much expense, the lawsuit was dismissed, and, as a settlement, the Original Ownership Group exchanged their ownership interests for contingent notes in amounts that would otherwise be payable to them should their ownership interests have received a distribution.

At the time it filed bankruptcy, the Debtors operated eleven restaurants. Blue Eagle, LLC, Buttermilk, LLC, Caribou Hunter, LLC, Gene Poole, LLC, Matchbox Capitol Hill, LLC and Matchbox Rockville, LLC (each a "Conveying Subsidiary" and collectively the "Conveying Subsidiaries"), as well as Hammer and a Cocktail, LLC, First MB Star, LLC, and Matchbox 14th Street, LLC (the "Non-Conveying Subsidiaries," and collectively with the Conveying Subsidiaries, the "Subsidiaries") each operated a separate restaurant at various locations in the Washington D.C. metropolitan area, Florida and Texas. Matchbox Food Group, LLC owns a controlling interest in each of the Subsidiaries and managed the finances of the Subsidiaries, each of which has filed for bankruptcy.[2] The income generated by the Subsidiaries and the Thompson Matchbox restaurants (described below) was ultimately deposited to the accounts of Matchbox Food Group, LLC and Matchbox Food Group, LLC, in turn, paid the expenses of the Subsidiaries and the Thompson Matchbox restaurants.

In August 2018, the Debtors raised further secured funding from Thompson Hospitality Group ("Thompson") in the approximate amount of $11 million. As part of that agreement, the Debtors entered into a management agreement with Thompson whereby Thompson would manage all of the Debtors' restaurants. The Debtors and Thompson also entered into a joint venture called Thompson Matchbox Ventures, LLC, which was owned at the time of formation 49% by Matchbox Food Group, LLC and 51% by Thompson. Thompson Matchbox Ventures, LLC also operates three Matchbox restaurants in Bethesda, Maryland, Silver Spring, Maryland, and Washington DC.

In May 2019, EagleBank declared a covenant default, and forbade further interest payments to subordinate lenders. No payments have been made on subordinate loans since then. Since that declaration of default, the Debtors sought a potential restructuring with Thompson.

As of the Petition Date, the Debtors were indebted to EagleBank, pursuant to various loan documents, including a promissory note executed on or about July 12, 2018 in the original

---

[2] Two restaurants operated by Matchbox Food Group, LLC have closed and have not filed for bankruptcy: DDB, LLC, which previously operated in Richmond, Virginia, and Matchbox LLC, which previously operated on H Street in Washington, D.C.

principal amount of $11,849,625.4. As of the Petition Date, the aggregate balance due and owing to secured creditors was

1. EagleBank: $10,433,121.67
2. The PIT Group: Approximately $13,000,000.00
3. Egg Cream, LLC: Approximately $14,000,000.00
4. Chesapeake Business Finance Corp. Approximately $350,000
5. Thompson Hospitality, LLC: Approximately $8.5 million.

The Debtors also raised approximately $5.05 million in unsecured funds from unsecured creditors, including Tuna, LLC, Ashtray Partners, LLC, and a group of investors referred to as the Daniel Neal Group.

The Debtors originally valued their assets at $27 million as an operating group. However, since the COVID-19 pandemic, all restaurant valuations, including the Debtors' restaurants, significantly decreased.

After significant negotiations, the Debtors have determined that their only likely purchaser was Thompson. Prior to filing bankruptcy, the Debtors engaged in extensive negotiations with Thompson and, agreed to an asset purchase agreement providing for the sale of the Debtors' assets for approximately $14 million, plus a delayed consulting fee of $4 million (the "First APA"). That First APA provided for various benchmarks regarding sales that the Debtors would be required to meet in order for Thompson to be required to close under the APA.

## ARTICLE IV.    CHAPTER 11 CASE

**A.    General Background of Case:** On August 3, 2020 (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for bankruptcy relief and protection under chapter 11 of the Bankruptcy Code. On August 11, 2020, the Court entered an order providing for the joint administration of all of the Debtors' cases [Docket No. 36]. The Debtors are continuing in possession of their property and the management of their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or committee of creditors has been appointed in these cases by the United States Trustee.

**i.    Schedules:** The Debtors filed Schedules of Assets and Liabilities (collectively, the "Schedules") with the Bankruptcy Court on August 28, 2020 and Amended Schedules D-F on September 25, 2020 (Docket Nos. 72 and 114). Among other things, the Schedules set forth, to the extent of the Debtors' knowledge, the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

**ii.    Claims Bar Date and Proofs of Claim:** The Bankruptcy Court established November 30, 2020, as the last date for Creditors  other than Governmental Agencies to file Claims against the Estate pursuant to the Notice of Chapter 11 Bankruptcy Case, and February 1, 2021 as the last date for Governmental Agencies to file Claims.

**B.    Rejected Leases:** During the cases, Hammer and a Cocktail, LLC and First MB Star, LLC rejected their leases effective as of the Petition Date. Matchbox 14th Street, LLC rejected its lease with Sivan Columbia, LLC effective as of October 1, 2020, resulting in an administrative claim of $57,159.67. Docket No. 161

**C.     Sale of Assets:**  After the bankruptcy was filed, the Debtors determined that the extended length of the COVID-19 pandemic meant that they were not likely to meet the benchmarks of the First APA.  Specifically, the First APA, which required the Debtors' sales in November of this year to total at least 70% of sales for the similar period in 2019.  Due to the COVID-19 lasting far longer than expected, the Debtors determined that this benchmark was unattainable.

The Debtors thus, subject to Court approval, entered into an Amended and Restated Asset Purchase Agreement (the "Consummated APA") with Thompson.    The Consummated APA required Thompson to make a one-time payment of $11,550,000.00 for (i) the assets of and equity in the Conveying Subsidiaries; (ii) all intellectual property and intellectual property rights associated with the "Matchbox" brand; and (iii) and for the assumption and assignment of the leases of real property held by the Conveying Subsidiaries (the "Sale Proceeds").  Additionally, Thompson agreed to pay to the Debtors estate a consulting fee in the amount of $550,000 at closing (the "Consulting Fee"), and agreed to waive certain claims against the Debtors at closing.

On October 7, 2020 the Court approved the Consummated APA as a stalking horse bid, and authorized bidding procedures for competing bids with regard to the Debtors' assets.  Docket No. 141.  The Debtors thereafter provided notice of an auction of its assets to counsel to (i) Thompson, (ii) counsel to all parties asserting secured claims; (iii) the Office of the United States Trustee for the District of Maryland; (iv) the Debtors' twenty (20) largest creditors and the Debtors' landlords; (v) all parties that filed a notice of appearance in these cases; (vi) any party who had, within the last twelve months, expressed an interest to the Debtors in purchasing the Debtors' assets; and (vii) various restaurant brokers and associations.  Despite significant efforts to market their assets, the Debtors did not receive a competing bid and no auction occurred.  On October 28, 2020, the Court approved the sale of the Debtors' assets to Thompson, and the assumption and assignment of the commercial leases of the Conveying Subsidiaries.  Docket No. 167.  The sale closed on or about November 15, 2020.

**D.     Remaining Assets**

After the Debtors closed on the sale, the Debtors now hold the following remaining assets.

1.      **Sale Proceeds:**  After payment of EagleBank's secured claims, claims of creditors holding trust fund claims under the Perishable Agricultural Commodities Act, and cure amounts owed to landlords, and reconciling amounts due under the Consummated APA with Thompson, the Debtors are holding approximately $718,000 in Sale Proceeds.

2.      **Consulting Fee:**  The Debtors are holding the $550,000 Consulting Fee.

3.      **Avoidance Actions**:  The Debtors are unaware of any fraudulent conveyances recoverable by their estates, or of any significant potential actions to recover preferential transfers based on payments made within the 90 days prior to the bankruptcy.   The Debtors did pay $46,184.75 in  prepetition debt to American Express after the filing of the bankruptcy case, which may be avoidable pursuant to 11 U.S.C. § 549.

### E.   Liabilities

After the Debtors closed on the sale, the Debtors now have the following liabilities.  A spreadsheet of allowed claims is attached as **Exhibit B.**

#### Secured Debts:

EagleBank has been paid in full on its secured claim as of the sale. Holders of the PIT Group assert secured claims, which are now of first priority in the approximate amount of $13,000,000.00, which is partially secured.  Egg Cream, LLC holds a claim of approximately $14,000,000.00, which is completely unsecured.  Thompson's secured claim of approximately $8.5 million has been released as part of the sale to Thompson.

#### Administrative Liabilities

- A. **UST fees**:  The Debtors estimate they will owe  approximately $105,000 due in US Trustee fees attributable to the sale of the Debtors' assets and $66,000 attributable to operations.
-
- B. **Attorneys Fees**: The Debtors estimate that it will owe  approximately $160,000 in attorneys' fees through the Effective Date, which is $143,000 more than the remaining  retainer provided to bankruptcy counsel.  The Debtors have determined 75% of the Debtors' attorneys fees are attributable to the sale of substantially all of the Debtors' assets, while 25% are attributable to operations.
-
- C. **Other Professional Fees**:  The Debtors estimate that it will have $25,000 in other professional fees due through the Effective Date.

**Priority Tax Debt:**  The IRS has filed a $556,543.90 priority tax claim based on an asserted excise tax due for tax year 2017.  Claim No. 7.   The claim relates to taxes purportedly owed under the Affordable Care Act.  The Debtors dispute this tax liability. A similar assessment was made for 2016 and resolved without any liability.  The Debtors expect to resolve this claim without any liability.

Additionally, the IRS has filed an estimated claim, for Federal Unemployment Tax Act (FUTA) withholding taxes in the amount of $44,898.91 against Matchbox Rockville, LLC, with $25,749.43 asserted to be entitled to priority.  Claim No. 19.  The Debtors expect this claim will be withdrawn, as similar claims against other Debtors have been, including claim no. 8 filed against Matchbox 14th Street, LLC and claim no. 20 filed against Blue Eagle, LLC.

**General Unsecured Debt:**  The Debtors have approximately $8 million in claims which have been filed or deemed as filed as general unsecured claims.  Additionally, the unsecured portion of the PIT Group's claims totals approximately $12.5 million; Egg Cream, LLC's completely unsecured claim totals approximately 14 million, and Chesapeake Business Finance Corporation's completely unsecured claim totals

approximately $350,000.  EagleBank asserts an unsecured claim of approximately $5.5 million pursuant to a Payroll Protection Program loan, which the Debtors expect to be forgiven in whole or in part.  Accordingly, the Debtors estimate general unsecured claims $34.8 in general unsecured claims.

**F.   Exclusivity:**  The Debtors' exclusive period to file a Chapter 11 plan pursuant to 11 U.S.C. § 1121 has expired.  Any party in interest may now file a plan.

## ARTICLE V.   <u>SUMMARY OF THE PLAN</u>

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST THE DEBTORS.

### A.    Purpose and Effect of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of its creditors.  The Debtors have filed the Plan as a means to maximize the value of the Debtors' Estates for the benefit of creditors.

The following is a summary of the significant provisions of the Plan.  The Plan contemplates (i) the substantive consolidation of the Debtors; (ii) the appointment of Marc E. Albert as disbursing agent; (iii) the distribution of the Sale Proceeds to attorneys fees incurred in the sale of the Debtors' assets, U.S. Trustee fees incurred in the sale of the Debtors' assets, and then to holders of secured claims in the PIT Group; the distribution of the Consulting Fee to U.S. Trustee fees attributable to operations, attorneys fees attributable to operations, to administrative claims attributable to operations, to the fees and expenses of the Disbursing Agent, including insurance, and then to holders of general unsecured claims, which include the unsecured portion of the claims holders of secured claims in the PIT Group, Egg Cream, LLC, Chesapeake Business Finance Corporations and all other unsecured creditors.

### B.    <u>Substantive Consolidation</u>

On the Effective Date, (i) all Intercompany Claims by, between and among the Debtors shall be deemed eliminated, (ii) all Assets and liabilities of the Debtors shall be deemed merged or treated as if they were merged with the Assets and liabilities of every other Debtor, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation of the substantively consolidated Debtors, (iv) the Interests of any Debtor in any other Debtor shall be cancelled, (v) each Claim filed or to be filed against any Debtor shall be deemed filed against the Debtors and shall be deemed a single Claim against and

a single obligation of the Debtors; and (vi) all Claims based upon guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect.

## C.    **Disbursing Agent**

On the Effective Date, Marc E. Albert (the "Disbursing Agent") will be appointed the Disbursing Agent under this Plan.  The Disbursing Agent's responsibilities shall include, without limitation: (i) prosecuting and/or settling the Causes of Action; (ii) prosecuting and/or settling objections to, and estimations of, Claims; (iii) liquidating the remaining property of the Estates, and providing for the distribution of the net sale proceeds thereof, in accordance with the provisions of the Plan; (iv) calculating and implementing all Distributions required under the Plan; (v) filing all required tax returns, and paying taxes and all other obligations on behalf of the Debtors from Estate funds; (vi) managing the wind down of the Debtors, and otherwise administering the Debtors; (vii) to purchase, with the Consulting Fee, directors and officers' tail insurance at the direction of the Debtors; (viii) engaging and compensating counsel and other professionals; and (ix) such other responsibilities as may be vested in the Disbursing Agent, or as may be necessary and proper to carry out the provisions of the Plan.  The Disbursing Agent's powers and authority shall include, without limitation, and without further Bankruptcy Court approval the power (i) to invest funds of the Estates, and withdraw funds of the Estates, make Distributions, incur obligations for reasonable and necessary expenses in liquidating and converting any remaining assets of the Debtors to Cash and pay taxes and other obligations owed by the Debtors and/or the Debtors from funds held by the Disbursing Agent in accordance with the Plan; (ii) to engage employees and professionals to assist the Disbursing Agent with respect to his  responsibilities, including, but not limited to, any Professionals employed by the Debtors and creditors; (iii) to prosecute, compromise and/or settle claims and Causes of Action and objections to Disputed Claims on behalf of the Debtors and the Estates; (iv) to liquidate any remaining assets, and provide for the Distributions in accordance with the provisions of the Plan; (v) to manage the continued liquidation of the Debtors' assets, and to otherwise administer the Debtors; (vi) to interpret the Plan in the Disbursing Agent's reasonable discretion; and (viii) such other powers and authority as may be vested in or assumed by the Disbursing Agent by any Court Order or as may be necessary, appropriate or incident to the performance of his duties under the Plan.  Mr. Albert shall have discretion to pursue, not pursue or settle, any and all Causes of Action and objections to Claims, as he determines is in the best interests of the Debtors and the Estates.

The Disbursing Agent shall be entitled to receive reasonable compensation for services rendered on behalf of the Estates.  The Plan provides that the Disbursing Agent may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, expert witnesses, consultants, and financial advisors, as needed to assist him in fulfilling his obligations under the Plan, and on whatever fee arrangement he deems appropriate, including, without limitation, hourly fee arrangements and contingency fee arrangements

## D.    **Classes of Claims**

The Plan divides Creditors into Classes based on their legal rights and interests and provides for the satisfaction of Claims from the sale of the Property.  This Article classifies Claims,

except for Administrative Expense Claims and Priority Tax Claims, which are not classified, for all purposes, including confirmation and distribution under the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the Class description. To the extent that part of the Claim or Interest falls within a different Class description, the Claim or Interest is classified in that different Class. The following table summarizes the Classes of Claims and Interests under this Plan.

| **CLASS** | **DESCRIPTION** | **IMPAIRED/ UNIMPAIRED** | **VOTING STATUS** |
|---|---|---|---|
| Class 1 | Non-Tax Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| Class 2 | Members of the PIT Group | Impaired | Entitled to Vote, |
| Class 3 | General Unsecured Claims including the unsecured balance of PIT Group, all Junior Lienholders, and other previously secured creditors | Impaired | Entitled to Vote |
| Class 4 | Interests | Unimpaired | Not Entitled to Vote, Deemed to Accept |

The treatment in the Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of an Allowed Claim may have in or against the Debtors, the Estates or their Assets. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtors, the Estates or Assets of the Debtors or the Estates.

## A.    Allowance of Unclassified Claims (Administrative Expense Claims and Priority Tax Claims)

Persons that hold Administrative Expense Claims and that do not timely file and serve a motion or application seeking payment in accordance with this Article and the Bankruptcy Code will be **FOREVER BARRED** from asserting those Administrative Expense Claims.

### 1.    Allowed Administrative Expense Claims Other than Professional Fee Claims

An Administrative Expense Claim that is not a Professional Fee Claim will be allowed only if, on or before the Administrative Expense Claim Bar Date, the Person holding the Claim both filed with the Bankruptcy Court a motion or application requesting that the Disbursing Agent pay the Claim and served the motion or application on the Debtors, the Disbursing Agent, and the U.S. Trustee. Persons seeking allowance of an Administrative Expense Claim under this paragraph shall be required to file a notice that the deadline to object to such allowance shall be the Administrative Expense Claims Objection Deadline. Provided, however, that the Disbursing

11

Agent may elect **to** deem an Administrative Expense Claim (other than a Professional Fee Claim) incurred in the ordinary course of the Debtors' businesses to be treated as an Allowed Administrative Expense Claim in accordance with the terms and conditions of the particular transaction that gave rise to the Claim without requiring the Person holding such Administrative Expense Claim to file a request for payment.

Any objection to an Administrative Expense Claim must be filed by the Administrative Expense Claims Objection Deadline.  In the event that an objection is timely filed to an Administrative Expense Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Expense Claim.

### 2.    Allowed Professional Fee Claims

Final Fee Applications must be filed no later than forty-five (45) days after the Effective Date.  Final Fee Applications will be noticed in accordance with the Bankruptcy Rules and Local Rules.  Objections, if any, shall be filed in accordance with the Bankruptcy Rules and Local Rules and served on the Professional whose Final Fee Application is being objected to, the Debtors, the Disbursing Agent, and the Office of the U.S. Trustee.  Failure to properly object to a Final Fee Application constitutes a waiver of a party's right to object to a Final Fee Application.

### 3.    Allowed Priority Tax Claims

The Claim of any Person holding a Priority Tax Claim will be allowed only if such Person filed a Claim prior to the Claims Bar Date and no objection to the Priority Tax Claim is filed by the Claims Objection Deadline.

In the event that an objection is timely filed to a Priority Tax Claim, the Bankruptcy Court shall determine the allowed amount of such Priority Tax Claim.  In the event that no objection is timely filed to an otherwise properly filed Priority Tax Claim, such Priority Tax Claim shall be deemed allowed in the amount requested.

## B.    **Treatment of Unclassified Claims (Administrative Expense Claims and Priority Tax Claims)**

### 1.    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive from the Disbursing Agent, in full and complete settlement, satisfaction and discharge of its Allowed Administrative Expense Claim, on the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date on which such Claim shall become an Allowed Claim, Cash equal to the unpaid portion of such Allowed Expense Administrative Claim; provided, however, that Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto by the Debtors.  Holders

of Administrative Claims will be paid in full on account of their Claims and are not entitled vote on this Plan. Holders of Administrative Claims will be paid from the Sale Proceeds to the extent such Administrative Claim was incurred in connection with the sale of substantially all of the Debtors' assets; and from the Consulting Fee to the extent such Administrative Claim was incurred in connection with the Debtors' operations.

2.     Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive from the Debtors, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. Holders of Priority Tax Claims shall be paid from the Sale Proceeds until such Sale Proceeds are fully depleted, and then from the Consulting Fee.

**C.     Classified Claims**

1.     Classification and Treatment of Non-Tax Priority Claims (Class 1)

**Classification:**          Class 1 consists of all Non-Tax Priority Claims.

**Treatment:**          Provided that a Non-Tax Priority Claim has not been paid prior to the Effective Date, and except to the extent that a holder of a Non-Tax Priority Claim agrees to a different treatment, each holder of an Allowed Non-Tax Priority Claim shall receive from the Debtors, in full and complete settlement, satisfaction and discharge of its Allowed Non-Tax Priority Claim, on the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date on which such Claim shall become an Allowed Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim. Class 1 is unimpaired under this Plan and is conclusively presumed to have accepted this Plan and, therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan.

The Debtors do not believe there are any holders of Non-Tax Priority Claims.

2.     Classification and Treatment of holders of Claims of the PIT Group (Class 2)

**Classification:**          Class 2 consists of holders of Claims of the PIT Group

**Treatment:**          The holder of each Allowed Class 2 Claim shall receive from the Disbursing Agent, in full and complete settlement, satisfaction and discharge of its Allowed Class 2 Claim, within 90 days of the Effective Date, to the extent

13

of the Sale Proceeds, after payment of allowed administrative, priority and U.S. Trustee fees incurred as attributable to sale of substantially all of the Debtors' assets, payment of the *pro rata* amount of its Allowed Class 2 Claim.  To the extent the holder of a Class 2 Claim is not paid in full from the Sale Proceeds, such holder shall have an Allowed Class 3 Claim without further action by the holder.  For instance, if the Sale Proceeds, after payment of allowed administrative, priority and U.S. Trustee fees incurred as attributable to sale of substantially all of the Debtors' assets, total $10.00, and the holder of a Class 2 Claim holds 20% of the Allowed Class 2 Claims, such holder will be entitled to payment of $2.00, and an allowed Class 3 Claim of $8.00.

Holders of Class 2 Claims are impaired and are entitled to vote to accept or reject this Plan.

A summary of Allowed Class 2 Claims is included at **Exhibit C.**

3.    Classification of General Unsecured Claims  (Class 3)

**Classification:**    Class 3 consists of General Unsecured Claims, including the Junior Lienholders and the unsecured portion of the claims of the PIT Group.

**Treatment:**     Except to the extent that a holder of an Allowed Class 3 Claim agrees to a different and lesser treatment, each holder of an Allowed Class 3 Claim shall receive from the Disbursing Agent, in full and complete settlement, satisfaction and discharge of its Allowed Class 3 Claim, on the later to occur of (i) 360 days from the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date on which such Claim shall become an Allowed Claim, payment of (1) its pro-rata share of the Consulting Fee after payment of allowed administrative, priority and U.S. Trustee fees incurred as attributable to the Debtors' operations; and (2) its pro rata share of any other Assets of the Debtors other than Sale Proceeds, including amounts obtained under the Debtors' reconciliation of amount due from Thompson under the APA, and recoveries of the Causes of Action.

Holders of Class 3 Claims are impaired and are entitled to vote to accept or reject this Plan.

A summary of Class 3 Claims is included at **Exhibit D.**

4.    Classification of Interests (Class 4)

**Classification:**    Class 4 consists of Holders of Interests.

14

**Treatment:**                    The Holders of Interests shall be entitled to keep their respective equity interests in the Debtors but will receive no distributions of any kind from the Estates.

Holders of Interests are unimpaired and not entitled to vote to accept or reject this Plan.

Notwithstanding any other Plan provision, Distributions will be made on account of a contingent, unliquidated, or disputed Claim only after, and only to the extent that, such Claim becomes an Allowed Claim, **provided, however**, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim shall be entitled to receive a Distribution on account of that portion of the Disputed Claim, if any, which the Debtors or Disbursing Agent does not dispute, which Distribution shall be made by the Disbursing Agent at the same time and in the same manner that such Disbursing Agent makes Distributions to Holders of similar Allowed Claims pursuant to the provisions of the Plan. Similarly, the Disbursing Agent will not make Distribution to Zero Dollar claims, or claims that were released, paid or satisfied during the Chapter 11 cases. A list of contingent, unliquidated, or disputed Claims is attached as **Exhibit E.**

## E.    Preservation of Causes of Action and Defenses

Unless expressly waived, released or settled in the Plan or any Final Order, the Disbursing Agent shall retain, and may exclusively enforce, any and all claims, rights, defenses and Causes of Action (including without limitation, claims, rights, defenses and Causes of Action not specifically identified, or which the Debtors may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors, at this time, or facts or circumstances which may change or be different from those which the Debtors believe to exist), whether arising before or after the Petition Date, in any court or tribunal, including but not limited to the Bankruptcy Court. The Disbursing Agent is authorized to exercise and perform the rights, powers and duties held by the Debtors' Estates, including without limitation the authority under Bankruptcy Code § 1123(b)(3) to provide for the settlement, adjustment, retention and enforcement of claims, rights, defenses and Causes of Action. The Disbursing Agent shall further have the power, and may exercise discretion, to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, defenses and Causes of Action, and shall not be required to seek Bankruptcy Court approval of such decisions.

## F.    Preclusion Doctrines

No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims, rights, defenses or Causes of Action upon, or after, the Confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such claims, rights, defenses or Causes of Action have been specifically released in the Plan or other Final Order. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall prevent the Disbursing Agent

from objecting to any Claim, except where such Claim is specifically allowed in the Plan or other Final Order.

No one may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any claim, right, defense or Cause of Action against them as an indication that the Disbursing Agent will not pursue any and all available claims, rights, defenses, or Causes of Action against them. The Confirmation Order shall not bar the Debtors or Disbursing Agent by res judicata, collateral estoppel, or otherwise from collecting, prosecuting, settling, or defending any claim, right, defense, or Cause(s) of Action.

**THE DISBURSING AGENT WILL MAKE THE DECISION TO PURSUE, NOT PURSUE OR SETTLE VARIOUS CAUSES OF ACTION IN ITS DISCRETION WITH THE ADVICE OF COUNSEL. THIS DECISION MAY BE BASED ON MANY FACTORS, INCLUDING BUT NOT LIMITED TO THE MERITS OF THE VARIOUS CAUSES OF ACTION AND THE COSTS REQUIRED TO PROSECUTE SUCH CAUSES OF ACTION. AS SET FORTH IN ARTICLE IX OF THE PLAN, THE DISBURSING AGENT, THE DEBTORS AND THEIR PROFESSIONALS, REPRESENTATIVES, MANAGERS, SUCCESSORS AND ASSIGNS SHALL NOT HAVE ANY LIABILITY ARISING OUT OF THE DISBURSING AGENT'S GOOD FAITH DETERMINATION OF WHETHER OR NOT TO PURSUE PROSECUTION OR SETTLEMENT OF ANY CAUSE OF ACTION.**

### G.    Exculpation

#### 1.    *Limitation of Liability in Connection with the Case, the Plan, Disclosure Statement and Related Documents*

Pursuant to § 1125(e) of the Bankruptcy Code, the Debtors and their professionals, managers, representatives, successors, and assigns (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Case, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); *provided*, *however*, that no Person shall be relieved of liability for fraud, gross negligence, intentional misconduct or the willful violation of federal or state securities laws or the Internal Revenue Code.

The Plan provides that all Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct. Any Plan Participant injured by any willful violation of the injunctions provided in the Plan shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

**H.     Injunction against Suing the Debtors, the Estates, and Estate Parties**

**The Plan provided that unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays provided for in the Cases pursuant to §§ 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.  On the Effective Date, all claims asserted against the Debtors by Creditors in each class included the Plan, shall be, to the fullest extent permitted by § 1141 of the Bankruptcy Code, satisfied, settled, released and discharged as against the Debtors, for any debt that arose before the Confirmation Date and any debt of a kind specified in §§ 502 and 503 of the Bankruptcy Code and all claims of any nature, whether or not (i) a proof of claim based on such debt or obligation is filed or deemed filed under § 501 of the Bankruptcy Code, (ii) such Claim is allowed under § 502 of the Bankruptcy Code, or (iii) the holder of such Claim has accepted the Plan.  Accordingly, upon the entry of the Discharge, all persons or entities which could have been claimants, and all actual claimants listed herein, shall be precluded from asserting any Claim against Debtor, based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, and the Confirmation Order shall permanently enjoin all such person or entities, and their successors and assigns, from enforcing or seeking to enforce any such Claim against the Debtor, except to the extent such Creditors are entitled to payment under the Plan.**

**I.     Disbursement of Sale Proceeds and Consulting Fee Under Plan**

Pursuant to the Plan, the Sale Proceeds will be disbursed as follows:

| | |
|---|---|
| Estimated Remaining Sale Proceeds | $718,000 |
| Less Estimated Attorneys Fees attributable to sale | $107,250 |
| Less Estimated U.S. Trustee Fees Attributable to Sale | $105,000 |
| Estimated Distribution to PIT Group | $505,750 |

Pursuant to the Plan, the Consulting Fee will be disbursed as follows:

| | |
|---|---|
| Consulting Fee | $550,000 |
| Estimated Administrative Expense Fees, Disbursing Agent Fees and Expenses, including Insurance | $250,000 |
| Less Estimated Attorneys Fees Attributable to Operations | $35,750 |
| Less Estimated U.S. Trustee Fees Attributable to Operations | $64,000 |
| Estimated Distribution to Unsecured Creditors from Consulting Fee | $200,250 |

17

Unsecured creditors will all receive the proceeds of all amounts obtained by the Disbursing Agent from Causes of Action, as well as from the reconciliation of account with Thompson.

**ARTICLE VI.     CERTAIN FACTORS TO BE CONSIDERED**

The Holders of Claims against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

## A.     Certain Bankruptcy Considerations

Even if all Impaired voting Classes vote in favor of the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, a showing that the value of Distributions to dissenting Holders of Claims and Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section VII.C. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides for certain conditions that must be fulfilled prior to Confirmation of the Plan and the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to Confirmation, if any, will be satisfied. If a chapter 7 liquidation were to occur, there is a substantial risk that the value of the Debtors' Estates would be substantially eroded to the detriment of all stakeholders.

## B.     Administrative and Priority Claims

As the number and amount of Priority Tax Claims and Administrative Claims are presently unknown to the Debtors, it is possible that, if the actual number and amount of Priority Tax Claims and Administrative Claims exceeds the Debtors' estimates, the amounts available to be distributed will be diminished. As set forth elsewhere in the Plan and the Disclosure Statement, the Debtors reserve the right to seek to dismiss or convert the Chapter 11 Cases.

## C.     Tax Consequences

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL AND STATE INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL AND STATE TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM. ACCORDINGLY, AS NOTED ABOVE, EACH HOLDER OF AN

ALLOWED CLAIM IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.

THE DEBTORS DO NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN.  CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTORS OR CREDITORS.

### 1.      Federal Income Tax Consequences to the Debtors

The Debtors are pass-through entities and accordingly will not incur any tax liability as a result of the Plan.

### 2.      Federal Income Tax Consequences to Creditors

The character, amount and timing of income, gain or loss the Holders of Allowed Claims may recognize as a consequence of the Distributions under the Plan will depend upon, among other things, (i) the manner in which the Claim or interest was acquired, (ii) the length of time the Claim was held, (iii) whether the Claim was acquired at a discount, (iv) whether the Holder of an Allowed Claim has taken a bad debt deduction for the Claim, (v) whether the Holder has previously included accrued but unpaid interest with respect to the Claim, (vi) the Holder's method of tax accounting, (vii) whether the Claim is an installment obligation under the tax laws, and (viii) the type of consideration received or deemed received by the Holder in exchange for its Claim. Therefore, Holders of Allowed Claims should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such Holders as a result thereof.

### ARTICLE VII.   <u>FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS</u>

#### A.      Feasibility of the Plan

The Bankruptcy Code requires that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, unless such liquidation is proposed by the plan. The Plan provides for the liquidation of the Debtors using the Sale Proceeds and the Consulting Fee, which are already in the Debtors' possession.  The Plan is thus feasible.

#### B.      Acceptance of the Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires that an impaired class

must vote to accept the Plan.

Bankruptcy Code Section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, Impaired Classes under the Plan will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting in each Class cast their Ballots in favor of acceptance.  Holders of Claims who fail to vote for the Plan are not counted as either accepting or rejecting that Plan.

## C.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted that plan.  The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

This analysis requires the Bankruptcy Court to determine what the Holders of Allowed Claims in each impaired Class would receive from the liquidation of the Debtors' Assets and properties in the context of a chapter 7 liquidation case.  A liquidation analysis is attached hereto as **Exhibit F.**

Based on the foregoing, the Debtors strongly believe that the prospects for recoveries by Holders of Allowed Claims would be significantly enhanced by Confirmation of the Plan and, conversely, would be significantly diminished if these chapter 11 Cases were converted to a chapter 7 liquidation.

## ARTICLE VIII.  <u>ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN</u>

The Debtors believe that the Plan affords Holders of Claims the potential for a better realization on the Debtors' Assets than a chapter 7 liquidation, and, therefore, is in the best interests of such Holders.

If, however, the requisite acceptances of voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of reorganization or liquidation; (b) liquidation of the Debtors' estates under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Debtors' cases under 11 U.S.C § 1112.

A.       **Alternative Plans**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization or liquidation.

With respect to an alternative liquidation plan, the Debtors have explored various other alternatives involved in the formulation and development of the Plan.  The Debtors believes that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any other potential plan of reorganization and liquidation, has the greatest chance to be confirmed and consummated.

B.       **Liquidation under Chapter 7**

If no Plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  As discussed above, the Debtors do not believe that unsecured creditors would receive a greater distribution under Chapter 7 of the Bankruptcy Code than they would under the Plan.

C.       **Dismissal of the Chapter 11 Case**

If no Plan is confirmed, the Proponent, the Debtors, or other parties in interest may seek dismissal of the Chapter 11 Cases pursuant to Bankruptcy Code section 1112.  Without limitation, dismissal of the Chapter 11 Casse would terminate the automatic stay and allow all Creditors to pursue the Debtors' remaining Assets without any procedure to ensure an equitable distribution.  Accordingly, the Proponent believes that dismissal of the Chapter 11 Cases would further reduce the value of the Debtors' remaining assets, and would lower the return to Creditors.

**ARTICLE IX.       THE SOLICITATION AND VOTING PROCEDURE**

A.       **Parties in Interest Entitled to Vote**

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or

interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

**B.      Classes Impaired and Unimpaired under the Plan**

Under the Plan, Classes 1 and 4 are Unimpaired and are presumed under Bankruptcy Code section 1126(f) to have accepted the Plan, and their votes to accept or to reject the Plan will not be solicited.  Classes 2 and 3 are Impaired under the Plan and are entitled to vote on the Plan, subject to the limitations set forth above.  Pursuant to Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

**[signatures on next page]**

## ARTICLE X.   <u>FURTHER INFORMATION</u>

**A.      Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact counsel for the Proponent:

Janet M. Nesse, Esq.
Justin P. Fasano, Esq.
McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770
Tel: (301) 441-2420
jnesse@mhlawyers.com/ jfasano@mhlawyers.com

## ARTICLE XI.   <u>RECOMMENDATION AND CONCLUSION</u>

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives.

Dated: December 21, 2020          Respectfully submitted,

Matchbox Food Group, LLC, Matchbox Rockville, LLC, Matchbox Capitol Hill, LLC, Gene Poole, LLC, Caribou Hunter, LLC, Buttermilk, LLC, Blue Eagle, LLC, First MB Star, LLC Matchbox 14th Street, LLC and Hammer and a Cocktail, LLC

_____

By: Larry Bensignor
Authorized Manager

Dated:  December 21, 2020          Respectfully submitted,

/s/ *Janet M. Nesse*_____
Janet M. Nesse, Esq (MDB # 07804)
Justin P. Fasano, Esq. (MDB # 28659)
6411 Ivy Lane, Suite 200
Greenbelt, Maryland 20770
(301) 441-2420: Telephone
(301) 982-9450: Facsimile
jnesse@mhlawyers.com
jfasano@mhlawyers.com
*Attorneys for the Debtors*

23